# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT BARNHOUSE, | ) | CASE NO. 5:07CV3557 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| GREGG McILVAINE, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

Before the Court is Defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (Doc. No. 8.)[1] For the reasons that follow, the motion is **DENIED**.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 14, 2007, Robert Barnhouse, Trustee of the McIlvaine Trucking, Inc. Employee Stock Ownership Plan ("ESOP"), brought this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") against Gregg McIlvaine, the former President and Board Member of McIlvaine, Inc., who, during all relevant time periods, was also a member of the ESOP Committee as well as the ESOP Trustee (i.e., a "fiduciary" within the meaning of ERISA).

Founded in 1959 by Defendant's father, McIlvaine Trucking, Inc. ("MT") is a commercial trucking company which focuses primarily on the transportation of propane, asphalt, and chemicals. (Compl. ¶ 12.) Defendant's father owned 164 shares of MT and Defendant

---

[1] Plaintiff filed a memorandum in opposition (Doc. No. 9) and Defendant filed a reply (Doc. No. 10); then both sides were granted leave to file additional briefs. (Doc. Nos. 12 and 15.)

owned the remaining 36 shares. (Compl. ¶ 18.) In June 1997, Defendant bought his father's shares of MT for $3 million ($18,292.68/share), financed with $500,000 paid at closing and a note for $2.5 million payable over five years. (Compl. ¶ 21.)

In September 1997, Defendant formed the ESOP, effective October 1, 1996. (Compl. ¶ 23.)[2] Defendant, acting as the sole member of the Board of Directors of MT, appointed himself as the sole member of the ESOP Committee[3] and as the ESOP Trustee. (Compl. ¶ 24.)

The complaint outlines the formation of various divisions of MT, as well as an expansion and reorganization, the details of which are not important at this juncture, except to note that by 1998 all of the former divisions and subsidiaries were joined under the umbrella of a holding company, McIlvaine, Inc. ("MI"). (Compl. ¶¶ 15, 17, 41.) Whereas MT had only 200 shares outstanding, MI issued 1,500,000 shares. (Compl. ¶ 41.) Immediately following its formation, MI was solely owned by Defendant. (Compl. ¶ 41.)

On December 30, 1998, Defendant sold to the ESOP 398,142 shares of MI at $15.07/share; this was 26.5% of the outstanding shares. (Compl. ¶ 45.) This was a "leveraged transaction." MI obtained a loan of $5.3 million from Wayne County Bank which was, in turn, loaned to the ESOP. Both loans had interest rates of 7.75%. The loan monies, added to $700,000 in cash from a contribution the ESOP had received from MT in 1998, were used to purchase the

---

[2] The document forming the ESOP is not available to the Court to check these dates; however, the discrepancy is not germane to this discussion.

[3] According to the ESOP Plan Document, the ESOP Committee was the named fiduciary for the ESOP and was supposed to have three members. (Compl. ¶ 23b.) Defendant, as the sole member of MT's Board of Directors, appointed himself as both the ESOP Trustee and the *sole* member of the ESOP Committee. (Compl. ¶ 24.) He held these three sole positions for most of the relevant time period.

shares for $6 million. (Compl. ¶ 49.) Thereafter, MI was to continue contributions to the ESOP, often in lieu of other forms of compensation. The ESOP used these contributions to repay the loan from MI and MI, in turn, repaid the bank loan. As the loans were paid down, the shares held in a suspense account as collateral for the loans, were released to ESOP participants. (Compl. ¶¶ 49-50.)

On July 26, 2000, despite a downturn in the company's profitability between 1998 and 2000, Defendant sold to the ESOP the remaining 1,101,858 shares of MI at $12.24/share, or $13 million. (Compl. ¶¶ 52, 60.)[4] This transaction was also leveraged. New financing was obtained from Amresco Commercial Financing and the first transaction's loan was refinanced, for a total of $14 million. The interest rate was 11.15%. (Compl. ¶ 63.)

At the time of the two stock-sale transactions, Defendant was both a fiduciary and a party-in-interest with respect to the transactions.

Following the 1998 SPA, Defendant engaged Stern Brothers to conduct yearly evaluations of MI's stock as required by ERISA for purposes of determining the ESOP's share value. (Compl. ¶ 51.) This was the same company he had hired to value the stock for the sale. Stern Brothers' first year-end valuation was performed in February 2000, valuing MI as of September 30, 1999.  (*Id*.) Even though MI's financial performance had dropped, making it appear less strong than in prior years as compared to publicly traded companies selected by Stern Brothers, MI's valuation dropped only from $15.07/share to $12.24/share on a minority basis. (Compl. ¶ 53.) As the sole ESOP fiduciary, Defendant did not question the valuation offered by

---

[4] The 1998 Stock Purchase Agreement ("SPA") has three signatures: (1) Defendant's, as selling shareholder; (2) Defendant's, as President of MI; and (3) Defendant's, as ESOP Trustee. (Compl. Exh A.) By the time of the second SPA, First Merit Bank was the ESOP Trustee, but Defendant still signed as the selling shareholder and the President of MI. (Compl. Exh. B.)

3

Stern Brothers. (Compl. ¶ 54.) Notably, ESOP participants were not entitled to a copy of the year-end valuation or any other information from which they might have been able to determine the reasonableness of either the purchase price paid by the ESOP or the first year-end valuation. (Compl. ¶ 55.) No ESOP participant, therefore, had any reason or means to question the valuation. Only Defendant was privy to that information. (Compl. ¶ 56.)

Both SPAs contained provisions that, if the sale transactions are ever determined to be "prohibited transactions" under either ERISA or the Internal Revenue Code, the parties to the SPA "shall take such action as shall be reasonably necessary and appropriate to correct any such prohibited transaction." (Compl. ¶¶ 46, 52.) Both SPAs contained a further provision that, if there is ever a "final determination" by the IRS, the DOL,[5] a court of competent jurisdiction, or otherwise that the fair market value of the shares was less than the purchase price paid by the ESOP, "the Selling Shareholder shall transfer an amount of cash, shares of the Company's Common Stock, or any combination thereof, as determined by the Selling Shareholder, equal in value to the difference between the Purchase Price and said fair market value for all such Shares." (Compl. ¶ 47; *see also*, Compl. ¶ 61.)

In February 2001, Defendant (still the only member of MI's Board of Directors) appointed Kim Marty to the ESOP Committee (Compl. ¶ 66), bringing the Committee's membership to two. The year-end valuations conducted by Stern Brothers placed the stock value for 2000 at $11.22/share; for 2001 and 2002, it was $7.14 per share; for 2003, $7.75/share; and for 2004 and 2005, $4.08/share. In none of these years did Defendant and/or Marty review or question the valuation. (Compl. ¶ 68.)

---

[5] Internal Revenue Service and Department of Labor, respectively.

On April 1, 2002, the DOL began conducting an investigation[6] specifically focused on the 1998 and 2000 transactions. (Compl. ¶ 69.) After a two-year investigation, on November 17, 2004, the DOL notified the ESOP Committee, via a letter addressed to the Committee in care of Defendant (*see*, Compl. Exh. C), that the two stock sales were "prohibited transactions" under ERISA. (Compl. ¶ 71.) Specifically, the DOL stated that Defendant "failed to make a good faith determination of the fair market value of the stock" and that valuations used for the two stock sales "contained overstated methodology assumptions and aggressive sales and income forecasts[.]" (Compl. Exh. C, p.4.) In addition, the DOL found the ESOP's summary plan description inadequate and its fidelity bonding coverage insufficient. To remedy these breaches, the DOL required that the ESOP Committee do the following:

(1)     obtain independent qualified appraisals which properly determine the fair market value of the Company stock purchased by the Plan from the Selling Shareholder as of the date of each transaction,

(2)     restore all losses, including lost opportunity costs, to the Plan and Plan participants which have resulted from the use of the original appraisals,

(3)     correct all of the loans associated with the prohibited transactions, specifically the three prohibited loans resulting from the transaction between the Plan and the Selling Shareholder in July of 2000,

(4)     file amended Annual Reports which correctly report the value of Company stock held by the Plan,

---

[6] According to the website of the Department of Labor: "The administration of ERISA is divided among the U.S. Department of Labor, the Internal Revenue Service of the Department of the Treasury (IRS), and the Pension Benefit Guaranty Corporation (PBGC). Title I, which contains rules for reporting and disclosure, vesting, participation, funding, fiduciary conduct, and civil enforcement, is administered by the U.S. Department of Labor. Title II of ERISA, which amended the Internal Revenue Code to parallel many of the Title I rules, is administered by the IRS. Title III is concerned with jurisdictional matters and with coordination of enforcement and regulatory activities by the U.S. Department of Labor and the IRS. Title IV covers the insurance of defined benefit pension plans and is administered by the PBGC." www.dol.gov/ebsa/aboutebsa/history.html (last visited 3/20/08.)

(5)     provide a complete and accurate summary plan description to all
        participants and provide a copy to [the DOL] office, and

(6)     obtain sufficient fidelity bonding coverage for the Plan and provide
        a copy of the corrected fidelity bond to [the DOL] office.

(Compl. Exh. C, p. 7.) Defendant never obtained independent appraisals or investigated the

transactions in any manner. (Compl. ¶ 88.)

        Prior to receipt of the DOL's letter, Defendant, as the sole member of MI's Board,

terminated First Merit Bank as the ESOP Trustee and appointed David Archer, MI's Vice

President of Sales, to replace the Bank as Trustee. (Compl. ¶ 74.) Although the DOL's letter had

been addressed to the ESOP Committee, Defendant never shared it with the other ESOP

Committee member or with First Merit Bank or Archer (as the former and new ESOP Trustees).

(Compl. ¶ 75.)  Apparently to avoid disclosure altogether, Defendant engaged private counsel

to respond to the DOL letter. (Compl. ¶ 76.) The law firm held itself out as representing the

ESOP Committee before the DOL, even though Marty, the other Committee member, had no

knowledge of the representation. (Compl. ¶ 77.) In fact, Defendant never told Marty or Archer

that the DOL was investigating the ESOP; he only mentioned in passing that *he* was being

investigated. (Compl. ¶ 77.) Both Marty and Archer were also employees of Defendant and did

not feel they could safely ask for any information. Archer even feared losing his job if he

questioned Defendant. (Compl. ¶ 81.)

        After the November 17, 2004 letter, on three occasions, Tolling Agreements with

the DOL were signed to toll the applicable statute of limitations with respect to any action which

might be brought by the Secretary of Labor under Title I of ERISA. The first Tolling Agreement

tolled the statute until September 30, 2005; it was signed by Defendant and by Marty, who

6

simply signed without questioning the purpose of the Agreement. (Compl. ¶¶ 82-83.) The second Agreement, tolling the statute until December 31, 2005, and the third, tolling it until March 30, 2006, were executed by the private law firm Defendant had hired, without Marty's knowledge. (Compl. ¶ 84.) Archer, the ESOP Trustee, was never told about any of the Tolling Agreements. (Compl. ¶ 85.)

Between November 2004 and June 2006, Defendant and the DOL debated the findings contained in the November 17, 2004 DOL letter. Eventually, in return for the DOL taking no further action, Defendant agreed to subordinate his loan to another one of the ESOP's loan, forgave approximately $1.3 million of the unpaid principal and interest on his Note, and lowered the ESOP's interest rate to 7%. (Compl. ¶ 89.) In a letter dated June 8, 2006, the DOL accepted this settlement, but specifically noted that it still considered the violations outlined in the November 2004 letter to be accurate, namely, that the two stock sales had been "prohibited transactions." (Compl. ¶ 91.)

Since 2003, Brott Mardis & Company ("BMC") has been MI's accounting firm and it audits both the company's financial statements and those of the ESOP. (Compl. ¶ 92.) In connection with the year-end audit for 2004, by letter dated July 6, 2005, Defendant made several representations which Plaintiff alleges were materially false, including that there were no violations or possible violations of any federal laws or regulations, that the ESOP had complied fully with fidelity bonding requirements, and that Defendant had apprised BMC of all communications with regulatory agencies concerning operation of the Plan. (Compl. ¶¶ 93-94.) As a result, BMC's audit report does not disclose the fact that on November 17, 2004 DOL had concluded that the two stock transactions were "prohibited transactions." (Compl. ¶ 95.)

7

On June 29, 2006, Defendant resigned from MI and the ESOP Committee. (Compl. ¶ 98). BMC did not learn about the November 17, 2004 letter until one month after it issued the 2005 Plan Audit. Its Plan audit for the year ended September 30, 2006 discloses for the first time that the DOL had investigated possible prohibited transactions. (Compl. ¶ 100.)

The complaint is set out in seven counts: (1) the 1998 Stock Transaction constituted a breach of fiduciary duty and a prohibited transaction by a fiduciary; (2) the 1998 Stock Transaction constituted a prohibit transaction by a party-in-interest; (3) the 2000 Stock Transaction constituted a breach of fiduciary duty and a prohibited transaction by a fiduciary; (4) the 2000 Stock Transaction constituted a prohibited transaction by a party-in-interest; (5) failure to investigate following the November 17, 2004 DOL letter constituted a breach of fiduciary duty; (6) failure to comply with the terms of the two Stock Purchase Agreements constituted breach of contract; and (7) failure to act solely in the interests of the plan participants from 2004 to 2006, but rather solely in his own interests, constituted a breach of fiduciary duty.

## II.

### STANDARD OF REVIEW

Defendant brings his motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Under Rule 12(b)(6), the Court must take all well-pleaded allegations in the complaint as true and construe those allegations in a light most favorable to the Plaintiff. *Dana Corp. v. Blue Cross & Blue Shield Mut.*, 900 F.2d 882 (6th Cir. 1990); *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485 (6th Cir. 1990). However, the Court need not accept as true a legal conclusion couched as a factual allegation. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). A well-pleaded allegation is one that alleges specific facts and does not merely rely upon conclusory statements. *Scheid v.*

*Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436-37 (6th Cir. 1988). The Court is to dismiss the complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

## III.

## LAW AND ANALYSIS

In his motion to dismiss, Defendant argues that Counts 1 through 5 and 7 are time-barred and Count 6 is preempted. Plaintiff contends that the ERISA claims are all timely because of the "fraud or concealment" exception to the six-year general statute of limitations. He further argues that because Counts 1 through 4 and Counts 5 and 7 do not involve the same conduct, the statute of limitations began to run at different times based on distinct violations of fiduciary duties. He finally argues that Count 2 is not preempted by ERISA because it focuses on Defendant's failure, in his capacity as "Selling Shareholder," to comply with the two SPAs.

### A.   Statute of Limitations (Counts 1, 2, 3, 4, 5 and 7)

Section 413 of ERISA provides:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of --

(1)    six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2)    three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

9

> except that in the case of fraud or concealment, such action may be
> commenced not later than six years after the date of discovery of
> such breach or violation.

29 U.S.C. § 1113. Interpreted simply, this statute's limitation period of six years runs from the

date of the breach or violation, except, where there is fraud or concealment, it runs from the date

of discovery of the breach or violation. The six-year period is reduced to three years if there is no

fraud or concealment and the plaintiff had actual knowledge of the breach or violation, in which

case the three years runs from the date the plaintiff gained such actual knowledge.

In his opening motion, Defendant argues that all of the ERISA claims (Counts 1-5

and 7) are time-barred because they arise from the prohibited 1998 and 2000 stock transactions

for which the six-year statute has already run. In particular, Defendant argues that Counts 1 and

2 were time-barred after December 28, 2004 (i.e., six years after the first SPA was executed) and

Counts 3 through 5 and 7 were time-barred after July 26, 2006 (i.e., six years after the second

SPA was executed). Plaintiff's complaint was filed on November 14, 2007.

Plaintiff counters that, due to Defendant's "fraud or concealment," the relevant

statute of limitations is six years after the date of discovery of the breach or violation, i.e., that he

had until November 14, 2013 to file. He further asserts that  Counts 5 and 7 must be analyzed

separately from Counts 1 and 2 and Counts 3 and 4 because each two-count set has its own

triggering date based on separate violations. Therefore, even if Counts 1 and 2 and Counts 3 and

4 are time-barred by the general six-year statute of limitations and not saved by any "fraud or

concealment" allegations, Counts 5 and 7 are still viable claims because they arose no earlier

than November 14, 2007.

In his reply brief, Defendant raises the argument that Plaintiff had "actual knowledge" of the stock transactions at the time they were completed, which requires application of a three-year statute of limitations. Plaintiff counters that "fraud or concealment" triggers an exception to *both* the general six-year statute and the actual knowledge three-year statute.

### 1.  "Actual Knowledge"

Although the general statute of limitations under ERISA Section 413(1) is six years, Section 413(2) provides that, where a person has "actual knowledge of the breach or violation," an action must be brought within three years. Therefore, if Plaintiff had such "actual knowledge" then some or all of the present claims might be time-barred.

Defendant argues that all ESOP participants, beneficiaries, trustees, and other fiduciaries had knowledge of all the essential facts of the stock-purchase transactions as of the dates the transactions were completed and, therefore, that the three-year statute of limitations began to run on the date of each of the two transactions, i.e., on December 30, 1998 and July 26, 2000.

Even though Plaintiff, who is the Chief Financial Officer of MI, is apparently a participant in the ESOP, the complaint does not state when he became a participant. It may be that he became a participant after all or most of the events alleged in the complaint had already occurred. Even assuming that he has been a participant for the entire time, the complaint alleges (and it must be taken as true for purposes of this motion) that no participant was privy to any information which would have supplied "actual knowledge" of anything more than the fact that two sales of stock had occurred.

There is some disagreement in the case law about what constitutes "actual knowledge" for purposes of starting the statute running. In *Wright v. Heyne*, 349 F.3d 321 (6th Cir. 2003), the Sixth Circuit set forth its position on the meaning of "actual knowledge." In *Wright*, the plaintiffs were retirement plan trustees who sued the plan advisers for breach of fiduciary duty. The Retirement Plan for which the plaintiffs were trustees had a commonly-managed general account and individual self-directed accounts for those participants who wanted them.  In late 1987, the trustees engaged the services of defendant Heyne to provide investment advice and services to the Retirement Plan with respect to the general account.  He was also retained by the individual participants to offer advice and services with respect to their self-directed accounts. Heyne had an ownership interest in Vestax Securities Corporation ("Vestax"). In December 1987, the general account and each of the individual accounts entered into a VesTrak Investment Analysis Service Agreement with Vestax to supply quarterly Investment Analysis Reports. In 1991 or 1992, two of the plaintiffs began to feel some dissatisfaction with Heyne and Vestax centering on perceived conflicts of interest, a concern that fees and commissions were driving Heyne's choice of investments, and his failure to follow their investment objectives. In 1992 and 1993, the plaintiffs sought independent review of the general account and their individual accounts, and were told that they had been receiving bad investment advice.  During 1995, the plaintiffs terminated their relationships with Heyne and sought investment advice elsewhere. In February 1997, plaintiffs retained the services of an attorney, who advised them that they had a valid ERISA claim for breach of fiduciary duties.  On October 28, 1998, they filed their lawsuit. The district court concluded that their claims were time-barred by the "actual knowledge" provision of ERISA. Plaintiffs took the position that "actual

knowledge" meant that they understood they had a legally cognizable claim. On appeal, the Sixth

Circuit joined the Seventh, Ninth and Eleventh Circuits

> in concluding that the relevant knowledge required to trigger the statute of limitations under 29 U.S.C. § 1113(2) is knowledge of the facts or transaction that constituted the alleged violation; it is not necessary that the plaintiff also have actual knowledge that the facts establish a cognizable legal claim under ERISA in order to trigger the running of the statute.

*Wright v. Heyne*, 349 F.3d at 330.

This description of "actual knowledge" must be understood, however, in the

context of the "basic policies served by statutes of limitations," namely, "preventing plaintiffs

from sleeping on their rights and prohibiting the prosecution of stale claims." *Id*. (citing *Board of

Regents of University of State of N.Y. v. Tomanio*, 446 U.S. 478, 487-88 (1980); *Johnson v.

Railway Exp. Agency, Inc.*, 421 U.S. 454, 463-64 (1975)). In other words, although a person

need not understand that a cognizable legal claim exists, there must be more than bare bones

knowledge of facts.  For example, in the instant case, mere knowledge of the fact that a stock

sale took place between Defendant and the ESOP, does not constitute "actual knowledge" to start

the statute running.   Rather, as the Sixth Circuit noted in *Wright*:

> Although the actions complained of in this case may not themselves "communicate the existence of an underlying breach," the extrinsic facts of which the Plaintiffs had actual knowledge demonstrate that Plaintiffs *must have known that they had been wronged* long before they consulted with an attorney.

*Id*. at 331 (emphasis added).

Here, even assuming that Plaintiff had knowledge of the fact of both the 1998

stock transaction and the 2000 stock transaction, that knowledge alone does not constitute

"actual knowledge of the breach or violation" for purposes of the three-year statute of limitations.

Based upon the facts alleged in the complaint, it appears that the earliest this Plaintiff could have had actual knowledge was on or after November 17, 2004, when the DOL determined that the two stock transactions were prohibited transactions under ERISA.[7]

Furthermore, Plaintiff's mere knowledge that stock sales had occurred is akin to knowledge that has been identified by the Eleventh Circuit as only "constructive knowledge," not the "actual knowledge" required by the statute. *See*, *Brock v. Nellis*, 809 F.2d 753 (11th Cir. 1987) (cited with approval by *Wright*). In *Brock*, the Secretary of Labor brought suit against two attorneys who formerly represented a pension fund, contending that they breached their fiduciary duties by counseling the fund's trustees to purchase property at a foreclosure sale at a price greatly exceeding the appraised value of the property. The Secretary sought to recover the $4 million loss to the fund. Although the Secretary did indeed know more than three years before bringing suit about the exaggerated price which the fund had paid, he did not know that the two attorneys had counseled the trustees to buy at that price. It was only when he discovered that connection that he had "actual knowledge" which started the three-year statute of limitations running. The *Brock* court pointed out that the three-year limitations period is "an exception to ERISA's six-year statute of limitations[,]" *id*. at 754, and that "Congress evidently did not desire that those who violate that trust could easily find refuge in a time bar." *Id*. That sentiment applies with equal force in the instant case.

---

[7] After discovery is complete, this conclusion may prove to be incorrect because the question of "actual knowledge" is quite fact intensive. However, on a motion to dismiss, the Court can only take as true those facts alleged in the complaint.

## 2.  "Fraud or Concealment"

In addition to the general six-year statute of limitations period and the abbreviated three-year statute of limitations period involving actual knowledge, there is yet another statute of limitations period that may apply if Defendant engaged in "fraud or concealment." In such case, an action may be commenced "not later than six years after the date of discovery of such breach or violation." This "fraud or concealment" exception overrides both the general six-year and the "actual knowledge" three-year statute of limitations.

The complaint contains many allegations that Defendant engaged in a pattern of behavior aimed at concealing his alleged breach of fiduciary duty from anyone who might be inclined to hold him responsible for that breach. In the first place, Defendant, as the sole Member of MI's Board of Directors, appointed himself to be the sole member of the ESOP Committee (which should have consisted of three members) *and* to serve as the ESOP Trustee. In other words, he held all of the decision-making roles with respect to the ESOP, making it virtually impossible for there to be any oversight. At this juncture in these proceedings, the Court must interpret that fact in favor of the non-movant and conclude that Defendant's wearing of "three hats" was probably designed to prevent oversight of his actions, which, if proven, would support Plaintiff's allegation of concealment, if not fraud.

Even when a second member was finally appointed to the ESOP Committee and even after Defendant was no longer the ESOP Trustee, he managed to evade passing on relevant information to the Committee and the Trustee, who, had they been privy to the information, might have been suspicious of Defendant's actions. In part he was successful in doing so because (according to Plaintiff's allegations) the other Committee member and the Trustee were both his

15

subordinates and apparently felt unable to challenge his iron-hand control of the ESOP and all decisions relating to it.

By far, however, the majority of the allegations of fraud or concealment relate to the period after November 17, 2004, when DOL notified the ESOP Committee (through Defendant) that the two stock-sale transactions were "prohibited transactions" under ERISA. The complaint alleges the following facts, which must be taken as true for purposes of the motion to dismiss:

Defendant terminated First Merit as Trustee and appointed David Archer, his suordinate, who had little understanding, experience, nor guidance regarding his fiduciary duties under ERISA. (Compl. ¶ 74.)

Defendant never shared the DOL's letter with the other ESOP Committee member (Marty), the Trustee (Archer), or the former Trustee (First Merit Bank). (Compl. ¶ 75.)

Defendant engaged his own personal counsel to respond to the DOL's letter. (Compl. ¶ 76.)

Defendant's personal counsel later indicated to the DOL that it also represented "certain Plan fiduciaries" even though no other person  was aware of the representation.(Compl. ¶ 77.)

The ESOP Committee never held a meeting or had any discussion regarding the DOL's investigation. (Compl. ¶ 78.)

Defendant never told Marty or Archer that the DOL's review was directed at the ESOP; he only mentioned that he was being investigated. (Compl. ¶ 79.)

Defendant never offered either Marty or Archer the opportunity to review the ESOP's records, the Stern Brothers valuations, the DOL's correspondence, or anything else regarding the ESOP. (Compl. ¶ 80.)

Neither Marty nor Archer ever asked for any additional ESOP information and believed Defendant would have refused to provide the information had they asked; Archer believed that he would have been immediately fired from his sales position at MI if he inquired any further; Archer requested the information from the DOL, which did not provide it. (Compl. ¶ 81.)

Three Tolling Agreements were executed between the ESOP Committee and the DOL, tolling the applicable statute of limitations with respect to any action brought by the Secretary of Labor under Title I of ERISA. Marty signed the first one on behalf of himself and in his capacity as a member of the ESOP Committee, but Defendant never explained the purpose of the document or that it was related in some manner to the ESOP. Defendant signed on behalf of himself and as an ESOP Committee member, as well as on behalf of MI and the ESOP. The other two Agreements were executed by Defendant's personal counsel on behalf of Defendant, Marty, the ESOP and MI, even though Marty still had no knowledge of this representation. Defendant never told Archer about these Agreements. (Compl. ¶¶ 82-85.)

Defendant did not (as demanded by the DOL) obtain independent, qualified appraisals regarding the 1998 and 2000 Transactions, or investigate the 1998 and 2000 Transactions in any manner. (Compl. ¶ 88.)

Defendant ultimately entered into an agreement with the DOL to subordinate his Note to another company debt, to forgive $1.3 million of unpaid principal and interest on his Note, and to lower the ESOP's interest rate to 7%, in return for the DOL agreeing to take no further action. (Compl. ¶ 89.)

In relation to the year-end 2004 ESOP Audit Report by BMC, by letter dated July 6, 2005, Defendant confirmed the following: there were no violations or possible violations of laws or regulations (including ERISA, DOL, and IRS regulations) whose effects should be considered for disclosure in the financial statements; the ESOP had complied with the fidelity bonding requirements of ERISA; there were no non-exempt party-in-interest transactions that were not disclosed; that he had apprised BMC of all communications, whether written or oral, with regulatory agencies concerning the operation of the plan; and that no events had occurred subsequent to the date of the plan's financial statement [dated September 30, 2004] that would require adjustment or disclosure in the financial statement. Each of these representations, among others, were materially false. Furthermore, no one had apprised BMC of the Tolling Agreements. (Compl. ¶¶ 93-94.)

BMC's ESOP Audit Report for September 30, 2004, dated July 6, 2005, does not disclose the fact that on November 17, 2004, the DOL concluded that the 1998 and 2000 transactions were Prohibited Transactions nor, for that matter, does it report any indication that the DOL was auditing the ESOP. (Compl. ¶¶  95-96.)

Defendant never disclosed to any ESOP participant, including Marty and Archer, the true terms and circumstances of the DOL's November 17, 2004 letter or the agreement by the DOL to take no further action. (Compl. ¶ 97.)

17

BMC did not learn of the DOL's conclusions until about one month following the issuance of the 2005 Plan Audit in June 2006. Only after Defendant's resignation did BMC review, for the first time, the DOL's November 17, 2004 letter. (Compl. ¶ 99.)

Taking these allegations as true, the Court must conclude that, as a result of Defendant's actions aimed at concealing the DOL investigation, no other ESOP participant or fiduciary, nor even the ESOP auditors, discovered the DOL's ultimate conclusion that the stock-sale transactions were "prohibited transactions" until approximately July 2006. (Compl. ¶ 99.) Plaintiff was not appointed ESOP Trustee until on or about October 20, 2006. (Compl. ¶ 2.) Arguably, that was his first opportunity to learn of the DOL's conclusion and to be privy to facts that would finally suggest that something was amiss with Defendant's behavior. Plaintiff filed this lawsuit on November 14, 2007, well within the six-year statute of limitations which applies in the case of "fraud or concealment."[8]

---

[8] Even if the Court were to apply the common law doctrine of fraudulent concealment, which allows for tolling of the usual statute of limitations, Plaintiff has satisfied that standard as well. Under *Pinney Dock and Transport Co. v. Penn Central Corp.*, 838 F.2d 1445 (6th Cir. 1988), a plaintiff must plead and prove the following:

> (1) the defendant concealed the conduct that constitutes the cause of action;
> (2) defendant's concealment prevented plaintiff from discovering the cause of action within the limitations period; and
> (3) until discovery plaintiff exercised due diligence in trying to find out about the cause of action.

*Id.* at 1465. The first element is clearly met, for purposes of a motion to dismiss, by taking the allegations of the complaint as true. The second element is also met for both stock-sale transactions by the various allegations cited *infra*. As to the third element, Plaintiff was not appointed ESOP Trustee until Defendant's concealment had been revealed; however, even if Plaintiff is held to the diligence of his predecessor, David Archer, the third element is satisfied since Archer contacted the DOL to determine the true circumstances of its investigation, but the DOL refused to disclose the details of an investigation that Defendant refused to accurately disclose to Archer. (Compl. ¶¶ 79-81, 90.) At the very least, these would be questions of fact that must be resolved before a motion to dismiss could be granted.

### 3. The General Six-Year Statute of Limitations

In his opening brief, Defendant argued that Counts 1 through 5 and 7 are all barred by ERISA's general six-year limitations period. It was only after Plaintiff responded that the "fraud and concealment" six-year limitations period applied that Defendant raised his "actual knowledge" argument. Since the Court has concluded that the six-year statute of limitations relating to "fraud and concealment" controls, there is no need to separately address the argument that all of these claims are barred by the general ERISA limitations period.

That having been said, the Court wishes to clarify that, even if Counts 1 and 2 and Counts 3 and 4 (which can be grouped for analysis purposes) would have been time-barred, Counts 5 and 7 would not be barred because, although related to the earlier counts, they actually allege separate and distinct breaches of fiduciary duty that arose only after November 14, 2004. Even under an "actual knowledge" analysis, these two counts would have been timely asserted.

## B. Preemption (Count 6)

ERISA Section 514 expressly provides that ERISA provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan[.]" 29 U.S.C. § 1144(a). This statutory preemption has been construed quite broadly. *See, e.g.*, *Briscoe v. Fine*, 444 F.3d 478, 497 (6th Cir. 2006) (emphasizing "the broad scope of ERISA's 'expansive pre-emption provision' ") (quoting *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 208 (2004)); *see also*, *Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1276 (6th Cir.1991) (recognizing "that virtually all state law claims relating to an employee benefit plan are preempted by ERISA").

19

In *Briscoe*, the court noted that, "[b]ecause of the amorphous nature of the phrase 'relate to,' courts have struggled to establish generally applicable rules governing which state laws 'relate to' or have a 'connection with' employee-benefit plans." *Briscoe*, 444 F.3d at 497. The court adopted the approach of the Fourth Circuit, which identified three classes of state laws preempted by ERISA, namely:

> state laws that (1) mandate employee benefit structures or their administration; (2) provide alternative enforcement mechanisms; or (3) bind employers or plan administrators to particular choices or preclude uniform administrative practice, thereby functioning as a regulation of an ERISA plan itself.

*Id*. (citing *Penny/Ohlmann/Nieman, Inc. [PONI] v. Miami Valley Pension Corp.*, 399 F.3d 692, 698 (6th Cir. 2005) (quoting *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1468 (4th Cir.1996)). Congress did not intend, however, for ERISA "to preempt traditional state-based laws of general applicability that do not implicate the relations among the traditional ERISA plan entities, including the principals, the employer, the plan, the plan fiduciaries, and the beneficiaries." *LeBlanc v. Cahill*, 153 F.3d 134, 147 (4th Cir.1998) (quoted by *PONI*, 399 F.3d at 698). As an aid to the determination whether a state law "relates to" ERISA, a court "must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995).

Defendant argues for dismissal of the breach of contract claim in Count 6 on the ground that it is completely preempted by ERISA. He first asserts that any relief which might be obtained through a contract claim is already anticipated among the remedies available under

20

ERISA for a "prohibited transaction." He also argues that the contract claim "relates to" the ESOP. Plaintiff counters that every claim that is "related to" an ERISA claim is not always preempted. In particular, if a claim's effect on an ERISA plan is tenuous, remote or peripheral, it is not preempted.

ERISA Section 409(a) provides that a fiduciary in violation of his or her fiduciary duties:

> shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate[.]

29 U.S.C. § 1109(a).

In the breach of contract claim set forth in Count 6 of the complaint, Plaintiff seeks to recover for Defendant's alleged violations of the provisions of the SPAs. He wants Defendant to repay in cash the difference between the fair market value of the shares and the amount paid by the ESOP for the shares in both of the stock-sale transactions, plus a reasonable rate of "lost income." (Compl. ¶ 129.) He also wants Defendant to "take such actions as necessary to correct such Transactions." (Compl. ¶ 134.) Finally, he wants "pre- and post-judgment interest, disgorgement, costs, expenses, attorney fees, and other monetary and equitable relief as may be appropriate." (Compl. ¶ 138.)

If, by engaging in the two stock-sale transactions which the DOL determined were "prohibited transactions," Defendant breached his fiduciary duties to the ESOP, then Plaintiff's remedies lie with ERISA Section 409(a). Under the "make good" remedies in Section

409(a), Plaintiff will recover on behalf of the ESOP all of the relief he seeks by way of his breach of contract claim.

On the other hand, no matter how a fact-finder might resolve the question of whether there was a breach of fiduciary duties by Defendant,[9] there would still remain the question of whether, as the Selling Shareholder, Defendant breached the express terms of either or both of the SPAs. That is, in the Court's view, a question arising out of a "contract *separate and distinct* from the ERISA qualified plan[.]" *PONI*, 399 F.3d at 699 (emphasis in original.) The claim does not necessarily arise from Defendant's duties as a fiduciary but, rather, from the terms of the SPAs to which he was a party.

The Court concludes that Count 6 is not preempted by ERISA.

## IV.

## CONCLUSION

For all of the foregoing reasons, Defendant's Rule 12(b)(6) motion to dismiss (Doc. No. 8) is **DENIED**.

---

[9] This would, admittedly, be a difficult conclusion to reach in the face of the DOL's November 17, 2004 letter, due to the "venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong[.]" *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 381 (1969); *see also Blessitt v. Retirement Plan for Employees of Dixie Engine Co.*, 848 F.2d 1164, 1167 (11th Cir. 1988) (courts owe "great deference to the interpretations and regulations" of the administrative agencies charged with enforcing and interpreting ERISA, including DOL). However, a skilled attorney might be able to convince a fact-finder that the DOL was wrong.

**V.**

**SUBSEQUENT PROCEEDINGS**

Now that the motion to dismiss has been resolved, Defendant shall file his answer to the complaint by no later than May 9, 2008.

By separate order, the Court will set the case for a Case Management Conference.


**IT IS SO ORDERED**.

Dated: April 29, 2008

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

23